

[691 NYS2d 35]

Nᴀᴛɪᴏɴᴀʟ Uɴɪᴏɴ Fɪʀᴇ Iɴsᴜʀᴀɴᴄᴇ Cᴏᴍᴘᴀɴʏ ᴏꜰ Pɪᴛᴛsʙᴜʀɢʜ, Pᴀ., Respondent, v Rᴏʙᴇʀᴛ Cʜʀɪsᴛᴏᴘʜᴇʀ Assᴏᴄɪᴀᴛᴇs et al., Appellants. (Action No. 1.)

Nᴀᴛɪᴏɴᴀʟ Uɴɪᴏɴ Fɪʀᴇ Iɴsᴜʀᴀɴᴄᴇ Cᴏᴍᴘᴀɴʏ ᴏꜰ Pɪᴛᴛsʙᴜʀɢʜ, Pᴀ., Respondent, v R. Rɪᴄʜᴀʀᴅ Wɪʟʟɪᴀᴍs, Appellant. (Action No. 2.)

First Department, May 18, 1999

### APPEARANCES OF COUNSEL

*Liza A. Chafiian* of counsel (*Richard F. Russell* on the brief; *D'Amato & Lynch,* attorneys), for respondent.

*Patrick C. Campbell, Jr.,* of counsel (*Andrew S. Fisher* and *Henry T. Berger* on the brief; *Fisher, Fisher & Berger,* and *Richard G. Phillips Associates, P. C.,* attorneys), for appellants in both actions.

### OPINION OF THE COURT

RUBIN, J.

An entity that extends credit to finance a business venture, especially one that merely provides a bond to guarantee performance of a party's contractual obligation, is not, by implication, a party to the underlying transaction and does not, without more, subject itself to claims or defenses otherwise available against a principal.

Plaintiff, which furnished a financial performance bond to defendants, investors in a real estate limited partnership, is not subject to the defense that the investors were fraudulently induced by the sponsor to purchase interests in the limited partnership. The propriety of the payment made by plaintiff under the performance bond is governed solely by its terms and, in the absence of express provisions to the contrary, is unaffected by any collateral agreement or dealings among the parties to the underlying commercial venture. Likewise, the obligation of defendants to indemnify plaintiff for any loss occasioned by payment under the performance bond is governed by the indemnification agreements signed by defendant investors with plaintiff, which comprise an integral part of the guarantee manifested by the financial performance bond.

Defendants are investors in Franklin Cimarron Pointe Associates, a failed real estate limited partnership formed to develop and operate an apartment complex in Oklahoma City. Defendants J. Christopher Burch and Robert Burch, through their own limited partnership, defendant Robert Christopher Associates, purchased a limited partnership interest in Franklin Cimarron Pointe Associates, paying $102,125 in cash and executing a promissory note in the amount of $532,125 for the remainder. Defendant R. Richard Williams purchased a like interest under identical payment terms.

Defendants Robert Christopher Associates and R. Richard Williams made three principal payments under their respective promissory notes. Following their default on subsequent payments, plaintiff satisfied its obligation under the terms of its financial performance bond, issuing payment to the holder of the notes given by the limited partners in the amount of $362,193.47 with respect to each. Plaintiff then brought these actions against each limited partner to recover this sum under the terms of the indemnity agreements with the respective defendants.

This matter was last before this Court for resolution of a dispute concerning the disparate forum selection clauses contained in the notes given by defendants to the lender and in the indemnity agreements executed by the limited partners in favor of plaintiff. On that appeal, we noted that while both writings comprise part of the transaction that provides indemnification to the holder of the notes, "each involves different parties and serves a distinct purpose" (223 AD2d 395, 396). Rejecting defendants' contention that because the notes and the indemnification agreements were contemporaneously executed they should therefore be read together, we held that the indemnification agreements are subject to suit in New York. In view of the contrasting provision in the notes conferring exclusive jurisdiction upon the Court of Common Pleas of Montgomery County, Pennsylvania, we dismissed plaintiff's cause of action as subrogee of the holder of the notes, without prejudice to the commencement of an appropriate subrogation action in the designated forum (*supra*, at 398).

Thereafter, plaintiff moved for summary judgment. In each of the two orders appealed from, Supreme Court struck the affirmative defenses and counterclaims and directed the Clerk to enter judgment in favor of plaintiff and against the respective defendants in the amount of $362,193.47, plus interest.

Defendants allege that they were fraudulently induced to invest in the limited partnership by the sponsor's failure to disclose that the success of its Oklahoma City apartment complex depended on continued prosperity in the oil and gas industry and that the industry was then in recession, which, according to their brief, "was actually having a devastating effect on, not only the regional economy, but the rental housing economy in particular." Defendants further contend that while the financial performance bond issued by plaintiff constitutes an unconditional obligation to pay the holder of the notes in the event of defendants' default, the indemnification agree-

ments signed by defendants "contain nothing which could even arguably have led the Defendants to believe that their obligations under the indemnification agreement[s] were unconditional and that they were effectively agreeing to waive any defense to payment under the note."

■ Defendants contend that Supreme Court erred in granting summary judgment to plaintiff based on the indemnification agreements they entered into with plaintiff. They argue that it is "at least fairly debatable whether reasonable minds could differ as to whether an indemnification agreement between a principal and surety creates an unconditional and absolute obligation of indemnification". Defendants rely on Federal case law in support of their position that the asserted ambiguity raises a question of fact precluding summary judgment.

Under circumstances similar to those of this case, several decisions conclude that it is uncertain whether plaintiff's obligation to make reimbursement under the indemnification agreement is conditional or unconditional. For example, in *National Union Fire Ins. Co. v Fremont* (760 F Supp 334, 338), the Federal District Court for the Southern District of New York stated: "Because the indemnity agreement does not specify which type of suretyship applies, it is ambiguous as to the type of suretyship the parties intended. This factual issue cannot be decided on a motion for summary judgment" (citing *National Union Fire Ins. Co. v Alexander*, 728 F Supp 192, 199 [SD NY]; *see also, National Union Fire Ins. Co. v Califinvest*, 1992 US Dist LEXIS 1956 [SD NY, Feb. 14, 1992, Stanton, J.]; *National Union Fire Ins. Co. v Cooper*, 1990 US Dist LEXIS 4878 [SD NY, Apr. 26, 1990, Stanton, J.]).

These cases are all derived from the Second Circuit Court of Appeals' decision in *National Union Fire Ins. Co. v Turtur* (892 F2d 199), which adopted a broad construction of *Rudman v Cowles Communications* (30 NY2d 1). In *Rudman*, the New York Court of Appeals was confronted with two contracts between the same parties, one providing for the acquisition of the plaintiff's business by the defendant and the other providing for the plaintiff's employment by a wholly owned subsidiary of the defendant. The Court stated (at 13), "Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact. In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances".

*Turtur* (*supra*) is factually similar to the matter under review. Investors in a limited partnership defaulted on notes secured by a financial performance bond issued by National Union, which had sued the defendants for reimbursement under the terms of its indemnification agreement (and also as subrogee of the holder of the notes). Expanding upon the notion that "a party may not compel performance of an agreement which that party has induced by fraud" (*National Union Fire Ins. Co. v Turtur*, *supra*, at 203), the Second Circuit Court concluded (at 204) that "since fraud in the inducement, like a material breach, excuses performance by the other party to a contract, there would appear to be no reason in principle why, if two contracts are part of the same exchange, a fraudulent inducement as to one of the contracts might not, in at least some situations,˙ excuse performance by the defrauded party of the other contract." In reversing the grant of summary judgment to the plaintiff guarantor, the Circuit Court cited the ruling in *Rudman v Cowles Communications* (*supra*, at 13), concluding, "The issue of the dependency of separate contracts, therefore, boils down to the intent of the parties. Questions of intent, we note, are usually inappropriate for disposition on summary judgment" (*National Union Fire Ins. Co. v Turtur*, *supra*, at 205).

In general, whether individual writings should be construed as mutually dependent or treated as distinct agreements is governed by the intent of the parties. However, even where two contracts involve essentially the same parties, as in *Rudman* (*supra*, at 13), the form of the agreements, though not conclusive, is significant, as the New York Court of Appeals emphasized in that case: "Recognizing that the agreements involved formally different parties, and actually executed on different dates in June, 1966, the conclusion of separateness becomes all but inescapable" (*supra,* at 13). Furthermore, even if the mutual dependency of the two contracts were to be established, the available remedy for nonperformance of one contract is rescission of the dependent contract which, "lying in equity, is a matter of discretion" (*supra,* at 13).

With respect to a guarantee of payment, the intent of the parties is subordinate to the terms of the instrument. This Court summarized the law governing a guarantee in *Bank of Tokyo-Mitsubishi v Kvaerner a.s.* (243 AD2d 1, 6): "Ordinarily, a guaranty, even if contemporaneously executed, is considered a distinct obligation. ' "A guarantee is an agreement to pay a debt owed by another which creates a secondary liability and

thus is collateral to the contractual obligation" ' (*Brewster Tr. Mix Corp. v McLean*, 169 AD2d 1036, 1037, quoting *Shire Realty Corp. v Schorr*, 55 AD2d 356, 359-360). Therefore, the guaranty is not read together with the contract it indemnifies, 'unless the history and subject matter shows them to be unified' (*Ripley v Intl. Rys.*, 8 NY2d 430, 438). In such case, 'the primary standard is the intent manifested, viewed in the surrounding circumstances' (*Rudman v Cowles Communications*, 30 NY2d 1, 13; *National Union Fire Ins. Co. v Williams, supra*, [223 AD2d,] at 396). 'The nature of the obligation depends upon the parties' intention, and where that intention "may be gathered from the four corners of the instrument, interpretation of the contract is a question of law" ' (*Brewster Tr. Mix Corp. v McLean, supra*, at 1037, quoting *General Phoenix Corp. v Cabot*, 300 NY 87, 92)." Under New York law, a guarantee is presumed to be a separate obligation (though not conclusively), and the determination of the issue is normally a question of law for the court. Thus, there is no bar to summary disposition of the issue.

Defendants' theory that the defense of fraudulent inducement is available against the guarantor of the notes fails to distinguish between the various financial transactions involved in this venture and the rights and obligations of the several parties with respect to each. In our last decision in this matter, this Court emphasized that the notes represent an obligation owed to the lender, or to a holder to which the lender might assign the notes, while indemnification is an obligation that runs to plaintiff, the guarantor of payment on the notes: "It bears. emphasis that plaintiff's involvement in the subject transaction is peripheral, even with respect to the related financing obtained from the lender pursuant to the notes. Plaintiff is merely the guarantor of payment on the notes, an obligation that runs only nominally to the limited partnership, which procured the bond, and ultimately to the holder in due course (which, at this juncture, is neither the limited partnership nor its lender). The choice of different law to be applied to each contract [note and indemnification agreement] and the designation of a different forum for the litigation of disputes arising out of its performance indicate that the respective agreements are intended to be separate" (223 AD2d, *supra*, at 396). While the notes and the assignment agreements represent distinct obligations owed to different parties by defendants, the assignment agreements and the financial performance bond are intimately related. "According the respective contracts their

appropriate place in the overall transaction, it is apparent that, in exacting the indemnification agreements from defendants, plaintiff bargained for the right to proceed directly against the purchasers of the limited partnership interests as a condition of providing the bond to secure repayment of their obligations under the notes. As a matter of long established law, the covenants of an agreement are dependent (*Kingston v Preston*, Lofft 194 [KB 1773], cited in *James v Bradley*, 2 Doug 684, 99 Eng Rep 437; Calamari and Perillo, Contracts § 146, at 235), and the obligation to bond payment on the notes undertaken by plaintiff is therefore construed as dependent upon defendants' indemnification of any payment made under the bond. Not surprisingly, the indemnification and pledge agreements signed by defendants recite as much at their inception" (223 AD2d, *supra*, at 397). The indemnification agreements are part of the consideration given by defendants for plaintiff's guarantee of payment. Together, the documents comprise the contract between the respective limited partner, the obligor under a note, and plaintiff, the guarantor of payment on that note. Therefore, should it be necessary, the Court will read these two documents together as integral components of the same transaction.

In its prior ruling, this Court also made it clear that the fraud asserted by defendants is not associated with the immediate transaction with the guarantor: "Defendants do not allege that their assent to indemnify plaintiff was obtained by fraud. Defendants obviously derived a benefit from the guarantee of their credit and, given plaintiff's peripheral involvement in the transaction, they will not be heard to belatedly complain that the indemnification agreements are tainted by illegality (*McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 471 ['There must at least be a direct connection between the illegal transaction and the obligation sued upon']). Defendants' avowed belief 'that the evidence will establish that * * * the plaintiff aided and abetted the fraud perpetrated * * * by providing a financing mechanism which they knew or reasonably should have known was being used to prop up a bogus investment scheme' falls far short of the specificity required to state a defense of fraud (CPLR 3016 [b]). It will certainly not suffice to support dismissal of a pleading (CPLR 3211 [a]), 'the operative criterion being that "a complaint should not be dismissed on a pleading motion so long as, when the plaintiff is given the benefit of every possible favorable inference, a cause of action exists" ' (*Harris v City of New York,*

147 AD2d 186, 189, quoting *Rovello v Orofino Realty Co.*, 40 NY2d 633, 634; *see also, Arrington v New York Times Co.*, 55 NY2d 433, 442)." (223 AD2d, *supra*, at 397.)

While defendants continue to assert that they should be relieved of the obligation to make payment under the indemnification agreements "because of fraud, securities fraud, misrepresentation and/or material breach", they have still not overcome the tenuous "connection between the illegal transaction and the obligation sued upon" (*McConnell v Commonwealth Pictures Corp., supra*, at 471). Nor have they established any connection between the alleged fraud and their obligation to indemnify plaintiff.

"An action for fraud requires that the plaintiff demonstrate the making of a material misrepresentation, known to be false, made with the intention of inducing reliance on the part of the victim, on which the victim does in fact rely and, as a result of which, he sustains damages" (*Ippolito v Lennon*, 150 AD2d 300, 303). However, a mere recitation of the elements of fraud is insufficient to state a cause of action; the fraudulent conduct must be related to the resultant damages in order to satisfy the requirement of proximate causation. By way of illustration, in *Megaris Furs v Gimbel Bros.* (172 AD2d 209), the plaintiff's principal asserted that he reasonably relied on assurances given by employees of the department store that it would continue to operate; that he was thereby induced to invest in an inventory of furs; and that he sustained a loss when the store ceased doing business and he was forced to liquidate the inventory. The plaintiff, however, was obligated under his contract with Gimbel Brothers to maintain a full inventory of furs, and the plaintiff could not be further induced to perform a duty imposed by a preexisting contractual obligation (*Ripley v International Rys.*, 8 NY2d 430, 441, *supra* ["A covenant to do what one is already under a legal obligation to do is not sufficient consideration for another contract."]). Therefore, even assuming that the plaintiff could have established a misrepresentation, he sustained no damages as a consequence that he would not otherwise have sustained in carrying out his contractual obligations. We observed that the plaintiff had made no "attempt to demonstrate the requisite nexus between the misrepresentation alleged to have been made and the injury said to have been sustained" (172 AD2d, *supra*, at 213).

Defendants herein do not assert that plaintiff made any misrepresentation concerning what, in hindsight, was a disastrous investment. Rather they seek to avoid their obligations to

plaintiff because of alleged misrepresentations made by the limited partnership's sponsor. Leaving aside the question of whether a slowdown in the oil and gas industry is a matter that could have been concealed from even the most casual reader of the financial press, defendants' argument is specious. It hardly follows that because x is defrauded in a transaction with y, x may therefore assert fraud as a defense to payment in a transaction with z.

The fallacy of a similar theory was noted by this Court in *First Nationwide Bank v 965 Amsterdam* (212 AD2d 469), in which the bank extended a nonrecourse, first-mortgage loan to finance 965 Amsterdam's purchase. Misrepresentations concerning the operating revenues of the property were attributed to the seller and to the mortgage broker that facilitated the loan. The debtor interposed fraud as a defense to the bank's action for payment on the theory that the bank's approval of financing for the transaction induced 965 Amsterdam to make the purchase. The debtor's written acknowledgment that the bank would rely on the debtor's representations as to the condition of the property and its revenue was held to be dispositive, precluding the defendant from asserting the contrary proposition. The Court further noted (at 472), "There is no suggestion that First Nationwide Bank, in making a favorable assessment of creditworthiness, thereby intended to make any warranty to the purchaser that the property was a sound investment (*see, Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood*, 80 NY2d 377, 384)." We went on to observe that, under the doctrine of caveat emptor, it was incumbent upon the "debtor to make an independent analysis of the suitability of the property for its purpose" (*First Nationwide Bank v 965 Amsterdam, supra*, at 472).

While defendants similarly allege a misrepresentation as to the suitability of their investment, there is an abject failure to identify any authority for their proposition that a misrepresentation allegedly made in the course of one transaction should operate to the prejudice of a party engaged in a separate transaction with defendants. Merely because defendants might be able to state a cause of action against the sponsor from whom they purchased their interests in the limited partnership does not mean that fraud can be asserted in defense of an obligation owed to an entity that provided financing for the transaction. Furthermore, each limited partner represented, in the respective assignment and pledge agreement, that "he has knowledge and experience in financial and business matters (or has quali-

fied and sophisticated investment counsel) and accordingly, he is capable of evaluating and has evaluated the merits and risks of investment in the Partnership". As this Court has stated, "where the party alleging fraud has made its own specific representation indicating that it is not relying on the alleged inducement, it is foreclosed from establishing its asserted reliance on the ground that it has misrepresented its true intention (*Citibank v Plapinger*, 66 NY2d 90, 94-95, citing *Danann Realty Corp. v Harris*, 5 NY2d 317, 323)" (*First Nationwide Bank v 965 Amsterdam, supra*, at 471).

Even assuming that the sponsor's asserted fraudulent misrepresentations could be ascribed to plaintiff, the remedy available to defendants, as they concede, is rescission. Plaintiff has rendered full performance of its obligations under the bond, and defendants have received the entire benefit of their bargain with plaintiff. As the indemnification agreements recite, the guarantee was obtained for the purpose of inducing the lender to extend financing to the partnership, which it did. Furthermore, plaintiff has honored its guarantee by making full payment to the holder of the notes given by defendants to the lender. The gravamen of the defense is therefore that, having received from plaintiff the very performance they bargained for, defendants should nevertheless be relieved of their own obligation to perform because of some misrepresentation made by a third party in the course of a transaction having only a tenuous connection to the subject agreement. This is not an argument calculated to induce a court of equity to lend its assistance.

The relationship between plaintiff surety and defendants is governed by the indemnity and pledge agreement signed by each (*see, Travelers Indem. Co. v Buffalo Motor & Generator Corp.*, 58 AD2d 978). Defendants contend that the agreements contain an ambiguity regarding whether their obligation to make restitution to plaintiff is conditional or unconditional, therefore precluding summary judgment. However, as noted, the interpretation of a contract is a question of law for the court. "Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact" (*Bethlehem Steel Co. v Turner Constr. Co.*, 2 NY2d 456, 460).

This Court discerns no ambiguity in the contract of indemnification. The agreement recites, "Upon Default of the Under-

signed, if the Company either pays any amount or incurs any expense on behalf of the Undersigned, such amounts paid or incurred shall be repaid to the Company immediately upon demand, together with interest thereon". Among the events that constitute default is "the Undersigned fails to make any payment under the Note". The obligation to make restitution is not qualified in any manner. It is conceded that defendants failed to make payments due under the notes, that plaintiff made payment in their stead and that reimbursement was demanded. Therefore, there is no question that defendants are liable to plaintiff under the terms of the agreement.

Defendants' contention that plaintiff should not have made payment to the holder of the notes because plaintiff had knowledge of their defense predicated on fraudulent misrepresentation is without merit. Under the terms of the performance bond, plaintiff's undertaking to pay upon the holder's declaration of a default is "absolute, unconditional and irrevocable" and is not subject to "any defense, set-off or counterclaim". Under these circumstances, plaintiff was required to fulfill defendants' obligations under the notes, irrespective of its subjective assessment of the holder's declaration (*BIB Constr. Co. v Fireman's Ins. Co.*, 214 AD2d 521; *see also, Maryland Cas. Co. v Grace*, 292 NY 194). Even if defendants were able to demonstrate a defense to payment under the notes, the assignment agreement is a separate contract and is not subject to the defense (*National Union Fire Ins. Co. v Allen*, 232 AD2d 80, 89).

To hold plaintiff, or any other institution extending credit to finance a business venture, responsible for misrepresentations made by a sponsor of the investment would burden the institution with matters collateral to its limited function and would expose it to liability as an insurer of the performance of the particular investment. As a practical matter, the additional burden thus imposed on the financial community, whether represented by liability for the disappointing performance or costs incurred in investigating the investment vehicle, would ultimately inure to the detriment of business and the investing public, which would be confronted by the inevitable increase in the cost of capital. Finally, as a fundamental principle, a contracting party—especially one denominated an investor— implicitly assumes the commercial risk that a change in market conditions may produce adverse economic consequences (*e.g., First Nationwide Bank v Gelt Funding Corp.*, 27 F3d 763, 772 [2d Cir] [real estate market collapse], *cert denied* 513 US

1079; *Iron Trade Prods. Co. v Wilkoff Co.*, 272 Pa 172, 116 A 150 [shortage resulting from contract vendee's purchases]; *see also, McCloskey & Co. v Minweld Steel Co.*, 220 F2d 101 [3d Cir] [shortage produced by Korean War]).

■ As a final matter, individual defendants J. Christopher Burch and Robert Burch maintain that plaintiff is not entitled to recover from them any amount for which their partnership, defendant Robert Christopher Associates, is liable. Their contention is based on this Court's ruling in *Helmsley v Cohen* (56 AD2d 519), which requires application of the equitable doctrine of marshaling assets where the assets of an individual partner are to be applied to a debt incurred by the partnership (*see also, Matter of Peck*, 206 NY 55, 60; *Meech v Allen*, 17 NY 300, 301-302). However, this doctrine was reviewed in *United States Trust Co. v Bamco 18* (183 AD2d 549), in which this Court noted (at 551): "it is an overstatement to assert, as defendants do, that it requires a creditor to affirmatively *establish* that partnership assets are insufficient before he is permitted to reach the individual assets of a partner. Only where a creditor seeks to dispense with joining the partnership as a defendant in an action upon the debt need it be affirmatively shown that pursuing the claim against the partnership would be futile because of its insolvency or inability to pay" ([emphasis in original] citing *Friedman v Gettner*, 6 AD2d 647, *affd without opn* 7 NY2d 764). The rule is one of pleading, and where a plaintiff has named the partnership as a party defendant, along with the individual partners, it is unnecessary to aver the insufficiency of partnership assets to satisfy the claim (*United States Trust Co. v Bamco 18, supra*, at 551).

Accordingly, the order of the Supreme Court, New York County (Lewis Friedman, J.), entered December 12, 1997, which, in action number 1, granted the motion of plaintiff-respondent National Union Fire Insurance Co. of Pittsburgh, Pa. for summary judgment and directed the Clerk to enter judgment in favor of plaintiff and against defendants Robert Christopher Associates, J. Christopher Burch and Robert Burch, jointly and severally, in the amount of $362,193.47, plus interest, should be affirmed, with costs. The order of the same court and Justice, entered December 15, 1997, which, in action number 2, granted the motion of plaintiff-respondent National Union Fire Insurance Co. of Pittsburgh, Pa. for summary judgment and directed the Clerk to enter judgment in favor of plaintiff and against defendant R. Richard Williams in the amount of $362,193.47, plus interest, should be affirmed, with costs.

ELLERIN, P. J., SULLIVAN and WALLACH, JJ., concur.

Orders, Supreme Court, New York County, entered December 12, 1997 and December 15, 1997, affirmed, with costs.